UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| N.B. by and through his mother, ANGELA BUCHANAN; R.F. by and through his mother, DANIELLE FRAVEL; J.J. by and through his mother, PHOEBE JOHNSON; M.Wa. by and through his mother, DEBORAH WALTERS; and M.Wн. by and through his mother, PATRICIA WHEATFILL, individually and on behalf of a class, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 11 C 6866 |
| JULIE HAMOS, in her official capacity as Director of the Illinois Department of Healthcare and Family Services, | ) ) ) ) | Judge Rebecca R.  Pallmeyer |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, five minors with behavioral or emotional disorders, have brought this suit, by and through their mothers, against the Director of the Illinois Department of Healthcare and Family Services (the "Department" or "HFS").  Plaintiffs seek declaratory and injunctive relief on their own behalf and on behalf of a class for alleged violations of the Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(43), 1396d(r); 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and the Rehabilitation Act § 504, 29 U.S.C. § 794.  Specifically, Plaintiffs allege that the Department fails to provide medically necessary behavioral and mental health services in the least restrictive setting.

Plaintiffs now move for class certification.  Also before the court is a motion to intervene filed by Robert F. Harris, the Cook County Public Guardian.  The Public Guardian seeks leave to intervene on behalf of three of his wards, who would represent a subclass of children who are in temporary custody or guardianship of the Illinois Department of Children and Family Services

("DCFS"). For the reasons explained here, Plaintiffs' motion for class certification and the Proposed Intervenors' motion to intervene are denied without prejudice.

## BACKGROUND

I.    **Legal Framework**

     A.    **Medicaid and EPSDT**

Medicaid, or Medical Assistance, is a joint federal- and state-funded program that provides medical assistance to needy aged or disabled persons and to families with dependent children whose income and resources are insufficient to meet the cost of care. *See* 42 U.S.C. § 1396. All states that participate in the Medicaid program must operate the program in conformity with federal statutory and regulatory requirements. *See id.* § 1396a. Each participating state must designate a single state agency to administer the state's Medicaid plan. *Id.* § 1396a(a)5. In Illinois, HFS is the single state agency responsible for the administration of the Medicaid program within the state.

Federal law requires states to fully implement the EPSDT program, which provides comprehensive and preventive healthcare services for children under age twenty-one who are enrolled in Medicaid. *See id.* § 1396d(r). Screening services required under EPSDT include "a comprehensive health and developmental history (including assessment of both physical and mental health development)." *Id.* § 1396d(r)(1)(B)(i). A state Medicaid plan must provide for "such screening services in all cases where they are requested." *Id.* § 1396a(a)(43)(B). The state plan must also provide for "corrective treatment the need for which is disclosed by such child health screening services." *Id.* § 1396a(a)(43)(C). Further, a state must provide "necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illness and conditions discovered by the screening services, whether or not such services are covered under the State plan." *Id.* § 1396d(r)(5).

The State of Illinois, as a participant in the Medicaid program, is required to provide EPSDT services. Plaintiffs claim that Defendant has failed to provide Plaintiffs and members of the

proposed class with intensive home- and community-based services that are "medically necessary to treat or ameliorate" their behavioral and emotional disorders. (Am. Compl. ¶ 130.) Neither the Medicaid Act nor the statutory provisions establishing the EPSDT provide for a private right of action, but the Seventh Circuit has recognized that Medicaid entitlements may be enforced via § 1983. *See Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 456-57 (7th Cir. 2007).

### B.    The "Integration Mandate"

Plaintiffs allege that the Department has not only failed to provide medically necessary home- or community-based services, but also that, in providing EPSDT-required services in institutional settings, the Department violates the the "integration mandate" of the ADA and the Rehabilitation Act. Title II of the ADA prohibits a public entity from excluding a qualified disabled person from participation in, or denying a qualified disabled person the benefits of, public services. 42 U.S.C. § 12132. Pursuant to regulations promulgated by the Attorney General under Title II, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). A public entity is relieved of its obligation under this "integration mandate," however, if it can demonstrate "that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* § 35.130(b)(7); *see also Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004). The Rehabilitation Act and its implementing regulations impose the same integration mandate on programs receiving federal financial assistance. *See* 29 U.S.C. § 794(a); 28 C.F.R. §§ 41.51(d), 41.53, 42.511(c); 45 C.F.R. § 84.12(c); *Radaszewski*, 383 F.3d at 607. In the seminal decision interpreting these provisions, the Supreme Court held that a state violates the integration mandate when the state unnecessarily segregates mentally disabled individuals—who could benefit from community-based care and who desire to receive such care—by placing them in institutions to obtain the services they need. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-602 (1999).

3

## II.    Care for Children with Behavioral and Emotional Disorders in Illinois

According to Plaintiffs, reports produced by the Illinois Department of Human Services ("DHS") and its various divisions—tasked by the State to provide streamlined access to integrated services to those with serious mental illness or developmental disabilities—demonstrate that Defendant has failed to provide EPSDT services to children with behavioral and emotional disorders in the most integrated setting.  Under state law, DHS must submit a bi-annual report "regarding the extent to which children (i) with developmental disabilities, mental illness, severe emotional disorders, or more than one of these disabilities, and (ii) who are currently being provided services in an institution, could otherwise be served in less-restrictive community or home-based setting for the same or for a lower cost."  20 ILCS 1305/10-55.  Pursuant to this directive, DHS released a report in March 2010 detailing the separate systems and funding streams in place to service those children with developmental disabilities and those with mental illness and severe emotional disturbance ("MI/SED").

The agency reported that out of 44,959 children (up to age 21) served by DHS's Division of Mental Health during FY2009, some 18,134 of them met the criteria for MI/SED.  (DHS, *Institutional Services for Children with Developmental Disabilities, Severe Mental Illness* (2010), Ex. A to Pls.' Mot. for Class Certification.)  The State provides funding for these children through what is called an "Individual Care Grant" ("ICG"), which families may choose either for alternative in-home/community services or placement in residential treatment facilities.  (*Id.*)  Through the ICG program, the Division of Mental Health provided 145 children living in their own homes with intensive community-based care in 2009, and provided an additional 75 receiving ICG funding with care at residential treatment facilities; 275 received ICG funding for institutionalized care.  (*Id.*)[1]  The

---

[1]    Notably, DHS also reported that of the 18,134 children who met the criteria for severe emotional disturbance, two percent received residential treatment services and two percent received intensive community-based ICG services.  (*Id.*)  These percentages do not match up with

(continued...)

report concluded that the average annual cost of ICG funding for institutionalized care ($105,938),

was greater than the projected average annual cost for intensive in-home support ($20,356) or child

group homes ($103,295). (*Id.*) The report does not, however, identity the number of children with

MI/SED who could benefit from home- or community-based care, but who are currently

institutionalized or in danger of institutionalization. Indeed, nothing in the record suggests that

Illinois has a system in place for identifying such children.

During the same fiscal year, DHS's Division of Developmental Disabilities served

approximately 8121 children and adolescents through the age of 17 with developmental disabilities,

with the vast majority (7621) receiving services in-home or in small group homes; only 500 of these

children received services in large institutional settings. (*Id.*) As part of the funding made available

for community-based services, the State established two Medicaid Home and Community-Based

Services Waivers for children and young adults with developmental disabilities ages 3 through 21.

(*Id.*)[2] In 2009, the Children's Support Waiver, which provides state funding for an array of in-home

---

[1](...continued)
the number of children reported to be receiving residential treatment through ICG funding (75), or
intensive community-based treatment (145). Neither does the report's assertion that a majority of
ICG clients (61%) are served in residential facilities. (*Id.*) The report does not explain these
discrepancies.

[2]     Subject to approval by the Secretary of Health and Human Services, state plans may
provide for payment of part or all of the cost of home- or community-based services where, but for
the provision of such services, an individual would require the more costly level of care provided
at a hospital, nursing facility, or intermediate care facility for the mentally retarded. 42 U.S.C.
§ 1396n(c)(1). As the court understands the terminology, the programs are referred to as "Waivers"
to reflect the Secretary's waiving certain Medicaid requirements of the regular state plan related to
statewideness, comparability, and income eligibility. *Id.* § 1396n(c)(3); *see also id.* § 1396n(c)(9)-
(10) (providing that the Secretary may limit the number of people who may receive funding under
a waiver, and the state may substitute additional individuals to replace those who have died or
become ineligible for services). The statute does not purport to waive a state's EPSDT obligations,
however, nor does it address the integration mandate of the ADA and Rehabilitation Act. The
applications for the Children's Support and Residential Waivers, submitted by the State and
approved by the federal Centers for Medicare & Medicaid Services, can be found on DHS's
website. *See Children's Residential Waiver*, http://www.dhs.state.il.us/page.aspx?item=
32363 (select "Children's Residential Waiver (pdf)" link) (last visited May 29, 2012); *Children's*
(continued...)

services, was authorized to serve up to 1100 children and young adults. (*Id.*) The Children's Residential Waiver, which provides funding for placement and treatment in child group homes, was authorized to serve up to 201 children. (*Id.*)

In contrast to the situation for children with MI/SED, the State appears to have a system in place for identifying children with developmental disabilities in need of home- and community-based services: the Prioritization of Urgency of Need for Services ("PUNS") database. PUNS is a statewide database that identifies persons with developmental disabilities who have requested services from the Division of Developmental Disabilities. *See PUNS Program Brochure (English Version)*, http://www.dhs.state.il.us/page.aspx?item=32444 (last visited May 29, 2012). The State uses the PUNS database to select eligible individuals to receive Children's Support or Residential waivers that become available based on need and length of time in the database; from those identified as eligible, recipients for whom there is sufficient funding are selected at random. *See Children's Support Waiver*; *Children's Residential Waiver*.

In May 12, 2011, the State of Illinois, through the Division of Developmental Disabilities, reported that there were 1138 persons who need "immediate support to stay in their own home/family home . . . due to person's serious health or behavioral issues." (Summary of PUNS Data (hereinafter "PUNS Report"), Ex. C to Pls.' Mot. for Class Certification). Persons classified as having "Emergency Need," are those individuals who need "in-home or day supports immediately." (*Id.*) The PUNS summary also reports an "Adults Only" statistic for the same category and reported for the same year 642 under the "Emergency Need" category (*id.*); subtracting that number from the total, the court infers that 496 children are under the "Emergency Need" category. There were also 3017 individuals identified as warranting "additional supports to

---

[2](...continued)
*Residential Waiver*, http://www.dhs.state.il.us/page.aspx?item=32365 (select "Children's Support Waiver (pdf)" link) (last visited May 29, 2012).

live in their own home or family home," from which the court infers 1627 are children. (*Id.*) This group of individuals is under the category of "Critical Need," because they "need support within one year." (*Id.*)

Finally, Plaintiffs note statements made by Illinois's Community & Residential Services Authority regarding failures in the provision of community-based care. The Authority is an interagency organization comprised of representatives from various Illinois agencies (including HFS, DHS, and its Divisions of Developmental Disabilities and Mental Health), and is responsible for developing policy and addressing disputes concerning the various agencies that provide services to children with "a behavior disorder or a severe emotional disturbance." 105 ILCS 5/14-15.01. In its 2009 Annual Report, the Authority explained:

> Children who exhibit multiple impairments/disabilities, including behavior disorders or severe emotional disturbances historically present challenges to Illinois' state service system as agencies and schools try to address the diverse service need of this population. Many of these children do not clearly fit the service eligibility criteria or funding streams of state and local public agencies and unacceptable numbers of children and families go un-served or are underserved by the very systems established to help them."

(Community & Residential Services Authority, *Annual Report FY 2009*, Ex. D to Pls.' Mot. for Class Certification.)

## III.    The Parties

The Plaintiffs are Medicaid-eligible children with behavioral or emotional disorders who need intensive mental and behavioral health services in order to correct or ameliorate their conditions. (Am. Compl. ¶ 1.) Despite doctor recommendations or PUNS classifications identifying Plaintiffs as in "emergency" or "critical" need for services, Defendant has not arranged or provided funding for intensive home- or community-based services for these children.[3] Plaintiffs allege that because

---

[3]    The parties appear to disagree about the terminology for the types of services settings available for people with developmental disabilities or MI/SED. Plaintiff repeatedly uses the term "home-based and community-based services," as distinguishable from institutional care

(continued...)

of the Defendant's failure to provide intensive home- or community-based services, the children have been, or are at risk of being, subject to unnecessary institutionalizations in times of crisis. (*Id.* ¶ 2.) Plaintiffs assert that segregation in such facilities severely limits a child's interaction with his or her family, school, peers, and community, thus exacerbating the child's condition. (*Id.* ¶ 41.) Any relief such segregation offers is short-lived, Plaintiffs claim, when children are discharged with little or ineffective follow-up community mental health care. (*Id.* ¶ 4.) All Plaintiffs allege that their local community mental health centers offer no intensive home- or community-based services. (*Id.* ¶¶ 60, 83, 98, 114, 128.) Instead, the centers allegedly offer only medication management and outpatient counseling once a week for one hour. (*Id.* ¶ 4.) Such minimal treatment is insufficient to treat children with significant behavioral and emotional disorders, Plaintiffs assert. Consequently, "many children and their families find themselves thrown back into a crisis, forced to repeat the cycle of institutionalization yet again." (*Id.*)

The court addresses the specific circumstances involving the named Plaintiff class representatives below.

### A. Plaintiff N.B.

Plaintiff N.B. is a fourteen-year-old boy who, since June 2009, has experienced approximately fourteen placements in Streamwood Behavioral Hospital in Streamwood, Illinois, averaging three weeks per placement. (Am. Compl. ¶ 42.) N.B. has a diagnosis of autism

---

[3](...continued)
provided in a hospital. Plaintiff includes residential placement in child group homes within the definition of "community-based services." (*See* Am Compl. ¶ 19(a).). It is not entirely clear, however, whether Plaintiffs mean "intensive residential service," "residential treatment setting," and "residential treatment facility" to refer exclusively to home-like settings such as child group homes, or whether those terms incorporate long-term care in institutional settings as well. In contrast, Defendant uses the term "institutional residential facilities," distinguishing such facilities from "community-based supports and services." (Def.'s Mem. of Law in Resp. to Pls.' Mot. for Class Certification at 13.) It is not clear whether Defendant intends the term "institutional residential facilities" to include child group homes as well as large institutional settings.

spectrum disorder, intermittent explosive disorder, mood disorder NOS,[4] disruptive behavior disorder NOS, and moderate to severe mental retardation. (*Id.* ¶ 43.) He has a significant history of maladaptive and self-injurious behavior, and is extremely aggressive and nonverbal. (*Id.*) Due to his repeated hospitalizations, two of his doctors have recommended that N.B. receive residential treatment. (*Id.* ¶¶ 46-47.) Despite these doctor recommendations, the State of Illinois denied N.B.'s funding request. (*Id.* ¶ 56.) The apparent reason for the rejection was that N.B. had not satisfied the criteria of "severely impaired reality testing." (Am. Compl. ¶ 57.)[5] Unlike the other Plaintiffs, N.B. does not allege that he is listed on the PUNS database. In addition to injunctive relief, N.B. seeks monetary damages, on his own behalf only, for the aggravation of his existing condition resulting from Defendant's failure to provide community-based services.

### B.    Plaintiff R.F.

Plaintiff R.F. is an eleven-year-old boy who has experienced approximately ten placements in The Pavilion Hospital in Champaign, Illinois. (*Id.* ¶ 61.) R.F. has a long history of bipolar illness with psychosis, manifesting as episodes of extreme mood swings, anger and irritability, and severe physical aggression. (*Id.* ¶ 62.) He has become a danger to himself and to others. (*Id.*) As with N.B., R.F.'s doctors have recommended that R.F. obtain treatment in a high-end residential treatment facility (*id.* ¶¶ 65-69), but R.F.'s community mental health center does not offer intensive home-based or community-based services. (*Id.* ¶ 83.) The State of Illinois has denied ICG funding for R.F. (the complaint does not say why), even though the State's Division of Developmental

---

[4]    "NOS" stands for "not otherwise specified," and denotes that an individual manifests a cluster of symptoms that do not meet criteria for the officially specified diagnoses. *See Diagnostic and Statistical Manual of Mental Disorders* 410 (4th ed., text rev. 2000).

[5]    To constitute "severe mental illness" for purposes of the ICG, a child's "[s]ymptoms *must* include severely impaired reality testing and *may* include hallucinations, delusions, avoidance or withdrawal from human contact, marked affective instability, apathy, bizarre behavior, deficient or unusual forms of communication, agitation and/or danger to self or others." ILL. ADMIN. CODE tit. 59, § 135.20 (emphasis added).

Disabilities has identified R.F. as being in "emergency" or "critical" need for such services in its statewide PUNS database. (*Id.* ¶¶ 79, 80.)[6]

### C.    Plaintiff J.J.

Plaintiff J.J. is a thirteen-year-old boy who has had four placements in psychiatric hospitals in the past year, including at Streamwood Behavioral Hospital and The Pavilion Hospital. (*Id.* ¶ 84.) J.J. has a diagnosis of intermittent explosive disorder, fetal alcohol syndrome, moderate mental retardation, methamphetamine exposure *in vitro*, and pervasive developmental disorder NOS. (*Id.* ¶ 85.) Defendant has refused to arrange or provide funding for treatment at a residential treatment facility, despite classifying J.J. as being in "emergency" or "critical" need for services in PUNS. (*Id.* ¶¶ 88, 95.)

### D.    Plaintiff M.Wa.

Plaintiff M.Wa. is a ten-year-old boy who has had five placements in psychiatric hospitals, including Streamwood, Lincoln Prairie Behavioral Health Center, and Methodist Medical Center. (*Id.* ¶ 99.) He has a diagnosis of oppositional defiant disorder, attention deficit hyperactivity disorder, moderate mental retardation, XYY syndrome, and a past history of bipolar disorder. (*Id.* ¶ 100.) Like N.B., R.F., and J.J., M.Wa. asserts that he needs a residential treatment facility for the most effective treatment of his mental and behavioral conditions. (*Id.* ¶ 102.) The State denied M.Wa. ICG funding, despite classifying M.Wa. as being in "emergency" or "critical" need for services in PUNS. (*Id.* ¶¶ 110-11.)

### E.    Plaintiff M. Wh.

Plaintiff M.Wh. is a five-year-old boy. (*Id.* ¶ 115.) He has a diagnosis of early onset bipolar disorder, pervasive developmental disorder NOS, autism, and a seizure disorder. (*Id.* ¶ 116.) His

---

[6]    It is not clear why R.F. is listed in the PUNS database. The complaint does not allege that R.F. has been diagnosed with a developmental disability, as have the other four Plaintiffs.

doctor has recommended an intensive community-based program. (*Id.* ¶ 15(c).) It is not clear whether the treatment M.Wh. seeks is in-home, or through other community-based treatment programs, such as day programs or other out-patient services. The State has denied M.Wh. funding despite classifying him as in "emergency" or "critical" need for services in PUNS. (*Id* ¶ 125.)

## IV. Proposed Class

Plaintiffs originally sought certification of a class defined as follows:

> All current and future recipients of Medicaid in the State of Illinois with behavioral or emotional disorders under the age of twenty-one who are not receiving medically necessary home and community-based services to treat or ameliorate their disorders, and are currently segregated, or who have been segregated or at risk of segregation for the purpose of receiving treatment and services.

(Pls.' Mot. for Class Certification at 1.) In response to objections to the breadth of this class definition (particularly its inclusion of "future Medicaid recipients"), Plaintiffs offered the following alternative:

> All recipients of Medicaid in the State of Illinois with behavioral or emotional disorder under the age of twenty-one who are not receiving medically necessary home and community-based services to treat or ameliorate their disorders, and are currently segregated, or who have been segregated or at risk of segregation for the purpose of receiving treatment and services.

(Pls.' Reply to Def.'s Response to Pls.' Mot. for Class Certification (hereinafter "Pls.' Reply"), at 6.)

After Plaintiffs' motion for class certification was fully briefed, Robert Harris, the Cook County Public Guardian, filed a motion to intervene on behalf of three children who are wards of the Cook County Juvenile Court, Child Protective Division. Similar to Plaintiffs, Proposed Intervenors are children who need home-based care to ameliorate behavioral and emotional problems in order to avoid future institutionalizations; none of the Proposed Intervenors appear to suffer from developmental disabilities, however. (Mem. of Law in Supp. of Mot. to Intervene at 4-6.) Unlike Plaintiffs, Proposed Intervenors, as wards of the State, are not eligible to receive an ICG to fund home- or community-based care. *See* ILL. ADMIN. CODE tit. 59, § 135.20(d). Additionally, the Proposed Intervenors allege that their "rights to services are governed not only by Medicaid laws,

11

but also by the Juvenile Court Act, Child and Family Services Act, and DCFS Rules, Procedures, and Policies." (Mem. of Law in Supp. of Mot. to Intervene at 11.) Should this court certify Plaintiffs' proposed class, the Proposed Intervenors seek recognition of a subclass defined as: "All current and future Medicaid eligible children, in the temporary custody or guardianship of D. Jean Ortega-Piron, the Department of Children and Family Services (DCFS) Guardianship Administrator, who are members of the N.B. class and represented by the Cook County Public Guardian." (Mot. to Certify Subclass, Ex. A to Mem. of Law in Supp. of Mot. to Intervene, at 12.)

## DISCUSSION

### I.  Class Certification

Class actions, which allow courts to resolve common issues of law and provide systemic relief, are "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). It is particularly important in a case such as this one for courts to resolve class certification issues carefully. Cases seeking to effect structural changes in a states' provision of aid to persons with disabilities tend to involve protracted litigation, of tremendous importance to thousands of disabled persons who have critical need for services they claim to have been denied by the state. Recently, the Courts of Appeals have upended remedial measures achieved in decade-long cases, reversing district courts on threshold issues. The Second Circuit, for example, vacated a remedial order and dismissed as moot a nine-year-old case on the grounds that the nonprofit organization that brought the suit did not have standing to seek enforcement of the "integration mandate" of Title II of the ADA and § 504 of the Rehabilitation Act. *See Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149, 152 (2d Cir. 2012). Similarly, the Seventh Circuit recently vacated a class-certification order and settlement in a decade-long case seeking structural reform in a school district's provision of special education services, concluding that the class definition was indefinite

and the proposed class did not satisfy Rule 23(a)(2)'s commonality prerequisite. *See Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 485-86 (7th Cir. 2012).

The court therefore approaches the class definition issue in this case with caution. A particular challenge is posed by the fact that Plaintiffs seek class certification at the very outset of the litigation. Doing so may well be prudent; the Seventh Circuit has emphasized Rule 23(c)(1)'s requirement that a certification order issue "[a]t an early practicable time after a person sues" in a case brought by developmentally disabled applicants against various state officials for failure to provide Medicaid waiver services. *See Bertrand*, 495 F.3d at 455 (noting that decisions on class certification must be made before a decision on the merits to avoid mootness, to allow opportunity for interlocutory review, and to allow for informed decisions about how discovery and briefing should proceed). The consequence of early focus on this issue, however, is that the parties have not yet engaged in discovery that could help bring the Defendant's policies and Plaintiffs' requested relief into greater focus.

### A. Rule 23(a) Prerequisites

In order to certify a case for class treatment, a case must satisfy the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the conditions in Rule 23(b). *See* FED. R. CIV. P. 23; *Jamie S.*, 668 F.3d at 493. Additionally, "a class must be sufficiently definite that its members are ascertainable." *Jamie S.*, 668 F.3d at 493 (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006)). Defendant concedes the issues of numerosity and adequacy of representation, but otherwise challenges Plaintiffs' motion for class certification on all of these grounds. The court addresses only one of these arguments: that Plaintiffs' claims are not typical of those within the broadly defined class they purport to represent.

A class representative's "claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her claims are based

on the same legal theory.'" *Oshana*, 472 F.3d at 514 (alteration in original) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).  Although the typicality requirement allows for some factual variation between the class representative's claims and the class members' claims, typicality "'primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large.'" *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).  In this respect, the commonality and typicality requirements tend to overlap—"[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *see also Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011).

In this case, there are several reasons for concern that the interests of the class representatives may not align with the interests of the class as a whole.  The court notes, first, that four of the five class representatives appear to have developmental disabilities, and the fifth is alllegedly listed in a state database that prioritizes care for the developmentally disabled.  Yet Plaintiffs define the class they purport to represent expansively to include all Medicare eligible children and young adults with "behavioral and emotional disorders."  This class definition presumably includes those children and young adults whose behavioral and emotional problems stem from MI/SED not attributable to a developmental disability.  Yet the State of Illinois has separate approaches for providing services to developmentally disabled and MI/SED youths; as the DHS report attached to Plaintiffs' motion for class certification demonstrates, the State of Illinois provides services for people with developmental disabilities and those with MI/SED through separate divisions within DHS (the Division of Developmental Disabilities and the Division of Mental Health, respectively), and the state has established separate systems, with distinct requirements,

14

for funding community-based care for each (ICGs for those with MI/SED and the Child Support and Residential Waivers for those with developmental disabilities). It is not clear to the court that Plaintiffs can effectively protect the interests of all of these class members.

In addition to MI/SED children without developmental disabilities, there appear to be other subgroups incorporated in Plaintiffs' broad class definition for whom Plaintiffs are not obviously representative. As the Proposed Intervenors point out, Plaintiffs' claims are not representative of Medicaid-eligible children within the State's foster care system, who are not eligible for an ICG. Furthermore, there may well be children and young adults who prefer treatment in an institutionalized setting. As drafted, the proposed class is limited to those youths "who are not receiving medically necessary home- and community-based services to treat or ameliorate their disorders" and who have been or are in danger of segregation in an institution. This class definition appears on its face to include class members who prefer segregation. At a minimum, it is not clear whether the class is limited to those youths who would prefer to stay in their homes and need services to do so—which would exclude those who prefer institutionalization—or whether the definition more broadly includes those youths for whom home- or community-based treatment is necessary to avoid institutionalization. If the broader definition is intended, it includes even those children who need and prefer institutionalization. Neither the motion for class certification nor the complaint recognizes class member preferences between institutional and community-based services. *Cf. Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 775 (7th Cir. 2007) (denying a motion to intervene made by developmentally disabled adults who preferred institutionalization because the class was limited to those "who would not oppose community placement").

Defendant argues that these typicality issues, and other concerns, doom any effort to certify a class here. The court is less certain. Typicality issues could well be resolved by a more carefully drafted class definition, or by division of the class into subclasses. With the aid of discovery, details concerning the State's policies for providing services to children with emotional and behavioral

disorders, and the nature of the relief Plaintiffs request, are likely to come into greater focus.  In light of the number of class actions seeking to enforce the ADA's "integration mandate" in this district alone, the court is not persuaded by Defendant's insistence that such claims are not amenable to class treatment.  *See, e.g.*, *Colbert v. Blagojevich*, No 07 C 4737, 2008 WL 4442597, at *10 (N.D. Ill. Sept. 29, 2008); *Williams v. Blagojevich*, No. 05 C 4673, 2006 WL 3332844, at *5 (N.D. Ill. Nov. 13, 2006); *Ligas ex rel. Foster v. Maram*, No. 05 C 4331, 2006 WL 644474, at *5 (N.D. Ill. Mar. 7, 2006); *cf. Collins v. Hamilton*, 349 F.3d 371, 372, 376 (7th Cir. 2003) (affirming the district court's judgment in a § 1983 class action brought against Indiana state officials for their refusal to fund "medically necessary" mental health treatment in long-term, inpatient care facilities for individuals under the age of 21, as required by EPSDT); *Memisovski ex rel. Memisovski v. Maram*, 92 C 1982, 2004 WL 1878332, at *1, *56 (N.D. Ill. Aug. 23, 2004) (concluding that the State of Illinois violated federal law by failing to provide EPSDT services to a class comprised of all Medicaid-eligible children in Cook County).  In short, substantial authority supports class treatment of claims of this nature.

### B.     Post-*Dukes* Certification Issues

Defendant has argued that the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), changes the analysis of class certification issues in cases such as this one. This court disagrees.  In *Dukes*, the Court found commonality absent in a Title VII class action brought by a nationwide class of approximately one and a half million female employees against Wal-Mart.  Plaintiffs there claimed that Wal-Mart's general corporate policy on employment matters gave discretion to local supervisors in thousands of stores who, in turn, allegedly discriminated against female employees.  *Id.* at 2554.  But as the Seventh Circuit has recognized, the holding in *Dukes* does not apply where discrimination results from a defendant's standardized conduct toward proposed class members, such as generalized policies that affect all class members in the same way.  *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 487-90 (7th

16

Cir. 2012) (allowing for class certification for a disparate impact claim challenging company-wide policies allowing brokers to form their own teams and distributing accounts based on broker performance).  Plaintiffs' complaint does not allege with any specificity what generalized policies Defendant has implemented concerning home- and community-based services.  But the absence of standardized policies for implementing community placements required by the integration mandate may itself be actionable; at least one court within this district has certified as presenting common questions of law a proposed class challenging the absence of such policies.  *See Ligas*, 2006 WL 644474, at *3.  Accordingly, common issues arise where "defendants have acted, or have failed to act, uniformly toward the proposed class based on their polices and lack of policies in place."  *Id.*

Defendant also argues that Plaintiffs cannot certify a class for injunctive relief under Rule 23(b)(2) because their request that the State provide medically necessary services in a home- or community-based setting constitutes "individualized relief."  Defendant again cite *Dukes*, this time for the proposition that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."  *Dukes*, 131 S. Ct. at 2557.  *Dukes*, however, considered whether claims for individual backpay awards are susceptible to certification under under Rule 23(b)(2).  The proposed class in this case does not seek any comparable form of monetary relief.  Indeed, Plaintiffs' complaint does not describe the injunctive relief they request, but the court does not understand them to be seeking judicial determination of the individualized services to which each class members is entitled under the EPTDS, and the court would be unwilling to grant such relief.  Instead, the complaint asks the court to determine whether the integration mandate requires the State to provide the services to which Plaintiffs are entitled in an integrated setting—a determination that does appear amenable to class certification.

17

The Seventh Circuit's recent decision in *Jamie S. v. Milwaukee Public Schools* is distinguishable for the same reason. In *Jamie S.*, the court reversed class certification in a case brought by special education students against the school district and the Wisconsin Department of Public Instruction for alleged violations of the Individuals with Disabilities Education Act ("IDEA"). 668 F.3d at 485-86. The district court had found defendants liable for various "systemic" violations of IDEA's procedural requirements. As relief for those violations, the court had established a complex remedial scheme that required the school district to craft "compensatory-education remedies"—an equitable remedy unique to IDEA claims that reimburses the out-of-pocket education expense incurred by children who were improperly delayed or denied entry into special education programs. *Id.* at 485; *see also Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 597-98 (7th Cir. 2006) (explaining a court's authority to award "compensatory education"). Reimbursement of out-of-pocket educational expenses is similar in kind to the equitable backpay remedy at issue in *Dukes*—both are forms of monetary relief that require determinations of each class member's individual circumstances. Accordingly, the Seventh Circuit held that the district court erred in certifying the case for class treatment under Rule 23(b)(2), concluding that "[w]hile the compensatory-education remedies will often or always be injunctive in nature, there can be no single injunction that provides final relief to the class as a whole." *Jamie S.*, 668 F.3d at 499.

The case before the court does not raise such concerns. Plaintiffs are not seeking reimbursement of out-of-pocket medical expenses that they may have incurred as a result of having been denied funding for home- or community-based services. Instead, they appear to seek the kind of relief sought in other cases in which courts in this district have certified classes: injunctive relief for violations of the "integration mandate" that require the defendants to "(1) inform individuals with disabilities that they may be eligible for community-based services and have the choice of such services, (2) regularly provide assessments to determine eligibility for community-based services, and (3) promptly provide appropriate services and support to qualifying individuals in the

18

community, creating a viable alternative to treatment in institutional settings." *Colbert*, 2008 WL 4442597, at *1. *Dukes* does not militate against certification of a class seeking such relief.

**II.       Motion to Intervene**

The Proposed Intervenors seek to establish a subclass of children who are wards of the state. Their motion to intervene is contingent on certification of the Plaintiffs' proposed class. (Mot. to Intervene at 1.) Because the court denies Plaintiffs' motion for class certification, the court need not address the merits of the motion to intervene, which is denied without prejudice.

## **CONCLUSION**

For the reasons explained above, Plaintiffs' motion for class certification [6] and Proposed Intervenors' motion to intervene [38] are denied without prejudice.  The court vacates the March 23, 2012 briefing schedule [41] for the motion to intervene.

ENTER:

Dated:  May 30, 2012

_____
REBECCA R. PALLMEYER
United States District Judge