**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| N.B., *et al.,* by and through their next friends, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 06866 |
| | ) | |
| JULIE HAMOS, in her official capacity as | ) | Judge John J. Tharp, Jr. |
| Director of the Illinois Department of | ) | |
| Healthcare and Family Services, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Nine children with mental health or behavioral disorders, through their guardians, bring this suit as a putative class action against the director of the Illinois Department of Healthcare and Family Services ("Department" or "HFS"). The four-count complaint alleges violations of the Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(43), 1396d(r) and Title II of the Americans with Disabilities Act ("Title II" or "ADA"), 42 U.S.C. § 12132, and the parallel provision of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504" or "RA"). The plaintiffs claim that HFS violates their rights by failing to provide medically necessary treatment—specifically, home or community-based mental health and behavioral services—in the most integrated setting appropriate to their needs. The plaintiffs seek declaratory and injunctive relief that would require HFS to implement appropriate screening and treatment alternatives to the acute care provided in general and psychiatric hospitals. One of the plaintiffs, N.B., also seeks monetary damages on his own behalf under the Rehabilitation Act.

This Court recently denied the defendant's motion to dismiss plaintiffs' claims, concluding that the plaintiffs stated a claim for relief under both the Medicaid Act and the disability discrimination statutes. It now takes up the plaintiffs' motion to certify a class under Federal Rule of Civil Procedure 23(b)(2). The plaintiffs' first request to certify the putative class was denied without prejudice. *See* Mem. Op. & Order, Dkt. # 45 (Pallmeyer, J.). For the reasons set forth below, the plaintiffs' amended motion is granted.

## BACKGROUND

Unlike a motion to dismiss, a motion for class certification does not require the Court to accept the plaintiffs' factual allegations as true: "Before deciding whether to allow a case to proceed as a class action . . . , a judge should make whatever factual and legal inquiries are necessary" to determine whether the requirements are met. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). The Court is required to make a "rigorous analysis" of whether the requirements for class certification have been met, and the Supreme Court has made plain that, where necessary to conduct that rigorous analysis, a trial court must resolve disputes about the merits of the claim. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011); *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160–61 (1982).[1]

In this case, however, the defendants have not disputed the plaintiffs' basic factual allegations in opposing class certification. Moreover, the substantive legal disputes—such as

---

[1] Thus, the plaintiffs' memorandum in support of its motion misstates the law when it asserts that, in considering class certification, the Court must accept as true all facts alleged in Plaintiffs' complaint. Mem. at 4. For that proposition, the plaintiffs rely on dicta appearing in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). In *Dukes*, however, the Supreme Court expressly limited that aspect of *Eisen* to the propriety of resolving the merits in order to shift the cost of class notice pursuant to Rule 23(c)(2). *See Dukes*, 131 S. Ct. at 2552 n.6; *see also Jaime S. v. Milwaukee Public Schools*, 668 F.3d 481, 493 (7th Cir. 2012) (analysis of Rule 23 requirements frequently entails resolution of merits issues). In light of these plain and recent statements by both the Supreme Court and the Seventh Circuit, the plaintiffs' misstatement should not have occurred.

whether the plaintiffs have any enforceable rights under the applicable statutes—were resolved on the defendant's motion to dismiss, leaving only the legal question whether this case is appropriate for class treatment. Accordingly, the Court sets forth the facts largely as alleged in the Second Amended Complaint.

A.     **The Named Plaintiffs**

The named plaintiffs are all Medicaid-eligible youths (under age 21) who have been diagnosed with various mental illnesses and/or emotional or behavioral disorders.

N.B. is a boy diagnosed with autism, intermittent explosive disorder, mood disorder not otherwise specified, disruptive behavior disorder not otherwise specified, and moderate to severe mental retardation. He is non-verbal, aggressive, and prone to self-injury. Existing family support and outpatient services have proven ineffective to manage N.B.'s conditions, leading to numerous hospitalizations at Streamwood Behavioral Hospital for three-week stints, followed by a return to the same inadequate outpatient services. According to the complaint, N.B. needs treatment in a residential setting in order to best ameliorate his conditions and restore him to his most functional level.

R.F. is a boy with bipolar illness with a history of psychosis. His illness renders him physically aggressive to himself and others, and he suffers from extreme mood swings, anger, and irritability. He has been hospitalized at least ten times at the Pavilion Hospital, a psychiatric facility, for three to four weeks at a time. In between hospitalizations, family care and existing outpatient services have been unsuccessful in managing his condition. According to the complaint, R.F. needs treatment in an intensive residential setting.

J.J. is a boy suffering from intermittent explosive disorder, fetal alcohol syndrome, fetal methamphetamine exposure, moderate mental retardation, and pervasive developmental disorder

not otherwise specified (an autism-like condition) ("PDD-NOS"). J.J. has been hospitalized at least four times at Streamwood and Pavilion Hospitals, and in between these hospitalizations, the available outpatient services and family care have been unsuccessful. According to the complaint, J.J. requires treatment in a residential setting.

M. Wa. is a boy diagnosed with oppositional defiant disorder, attention deficit hyperactivity disorder, moderate mental retardation, XYY syndrome, and he has been diagnosed with bipolar disorder in the past. He has been hospitalized at least five times at Streamwood and at Lincoln Prairie Behavioral Health System. In between hospitalizations, family care and available outpatient services have been insufficient to adequately care for him. According to the complaint, M. Wa. requires treatment in a residential setting.

Plaintiff M. Wh. is a young boy with diagnoses of early onset bipolar disorder, PDD-NOS, autism, and a seizure disorder. A doctor, Holly M. Maes, has recommended intensive community based care[2] to correct or ameliorate his conditions; according to the complaint, without such care, M. Wh. is at risk of hospitalization.

Plaintiff M.B. is a teenaged girl with a significant history of suicidal ideation and maladaptive and self-injurious behaviors. She has mental illness or severe emotional disorders

---

[2] Despite invoking it repeatedly, the plaintiffs never define the term "home or community-based services." Federal Medicaid regulations, 42 C.F.R. § 440.180, define the term for purposes of the waiver program, to include the following services: "(1) Case management services; (2) Homemaker services; (3) Home health aide services; (4) Personal care services; (5) Adult day health services; (6) Habilitation services; (7) Respite care services; (8) Day treatment or other partial hospitalization services, psychosocial rehabilitation services and clinic services (whether or not furnished in a facility) for individuals with chronic mental illness . . . ; (9) Other services requested by the agency and approved by CMS as cost effective and necessary to avoid institutionalization." However, it is not clear whether the plaintiffs mean to invoke this regulation.

("MI/SED") not attributable to any developmental disability,[3] including major depressive disorder, posttraumatic stress disorder, ADHD, and suicidal ideation. She was hospitalized about 10 times in the two years before the Second Amended Complaint was filed, for one- to four-week periods. A doctor, Paras Harshawat, has determined that M.B. requires treatment in a residential setting, and without it, she is at risk of more hospitalizations.

S.B. is a teenaged girl diagnosed with schizophrenia-paranoid type and ADHD, neither attributable to a developmental disability. She was hospitalized for her conditions in March 2011, and since her discharge, existing outpatient services and family care have not been adequate to correct or ameliorate her conditions. According to the complaint, S.B. requires an intensive community-based program, without which she will be a risk for institutionalization.

I.D. is a young boy with MI/SED not attributable to a developmental disorder, including bipolar disorder, mood disorder not otherwise specified, reactive attachment disorder, and ADHD. He experienced six hospitalizations in the two years before the Second Amended Complaint was filed, and was hospitalized for 122 days in one six-month period. In between hospitalizations, the available treatment options have been inadequate. A doctor, Christopher Sinnappan, has determined that I.D. requires treatment in a residential setting.

S.M. is a young man diagnosed with neurodevelopmental disorder, fetal alcohol syndrome, mood disorder, and ADHD. He has been psychiatrically hospitalized once and has grown increasingly verbally and physically aggressive. A doctor, Charles E. Burda, has

---

[3] As Judge Pallmeyer pointed out in her decision denying the first motion for class certification without prejudice, "the State of Illinois has separate approaches for providing services to developmentally disabled and MI/SED youths"; these approaches implicate separate divisions of the Department and different funding systems. Mem. Op., Dkt. #45 at 15. It is because of this concern that the Plaintiffs joined in their Second Amended Complaint plaintiffs, such as M.B., whose diagnoses are not attributed to a developmental disability.

determined that S.M. risks a lifetime of institutionalization without appropriate therapeutic care in a residential setting.

## B. Class Allegations

The Second Amended Complaint alleges that the State of Illinois Medicaid program fails to meaningfully provide intensive community-based residential or outpatient care for children with mental illness and emotional or behavioral disorders, instead over-relying on hospitals to provide temporary acute care, followed by grossly inadequate outpatient services consisting of little more than medication management and one hour per week of counseling. The plaintiffs allege that the state fails to provide for intensive and individualized care in an integrated setting, instead requiring their segregation in hospitals in order to access appropriately therapeutic care. The plaintiffs define the putative class as:

> All recipients of Medicaid in the State of Illinois under the age of 21 who are not receiving medically necessary home and community based services to treat or ameliorate their disorders, and are currently segregated, or who have segregated or [are] at risk of segregation for the purpose of receiving treatment and services and who would not oppose community services.

## DISCUSSION

The plaintiffs move to certify this class under Rule 23(b)(2), which provides for class treatment where the general prerequisites of Rule 23(a) are satisfied and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 369–70 (7th Cir. 2012).

## A. Rule 23(a) Requirements

The four Rule 23(a) requirements are numerosity, commonality, typicality, and adequate representation of the class by the named plaintiffs and their counsel. Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011). The last of these—adequacy of representation—is not challenged by the defendant (*see* Mem., Dkt #26 at 14[4]) and the Court agrees that the requirement is met. There is no foreseeable conflict of the named plaintiffs' interests with those of the class, and plaintiffs' counsel are appropriately qualified and experienced.

In addition to challenging the other enumerated Rule 23(a) requirements, the defendant also argues that the class cannot be certified because the class definition is insufficiently definite to allow proper evaluation of those requirements, particularity numerosity. This is a challenge to the ascertainability of the class. *See Jaime S.*, 668 F.3d at 493; *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). "[A]scertainability entails two important elements. First, the class must be defined with reference to objective criteria. Second, there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013) (internal quotation marks and citations omitted). *See also* 5 James Wm. Moore *et al.*, MOORE'S FEDERAL PRACTICE § 23.21[3][a] (3d ed.

---

[4] Rather than straightforwardly presenting her arguments, the Director selectively incorporated into her response brief, Dkt. # 56, portions of her prior brief on class certification, Dkt. # 26. This is generally not an accepted practice (*see, e.g.*, L.R. 7.1 Briefs: Page Limit), and it needlessly complicated this Court's resolution of the instant motion, particularly where it was the predecessor judge, not this Court, who had prior familiarity with the incorporated arguments, the pleadings were amended after the original decision, and the second motion for class certification reflects that amendment and is not identical to the first.

2012) ("For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria."). As the defendant's argument reflects, ascertainability is really a threshold issue—if the class cannot be identified, then courts cannot reliably assess whether an action on behalf of that class satisfies the express requirements of Rule 23. Accordingly, the Court takes up that argument first.

### 1. Class Definition

The Director contends that "the new class definition is so indefinite that the individual members cannot be identified short of conducting highly individualized evidentiary hearings." Mem., Dkt. # 56 at 7. This argument primarily hinges on her interpretation of the phrase "medically necessary." According to the defendant, "expert evidence is necessary to enable the court to evaluate and determine which Medicaid-eligible children are not receiving 'medically necessary services . . . to treat or ameliorate their disorders.'" Mem., Dkt. # 56 at 4. The defendant analogizes the putative class to the one invalidated in *Jamie S.*, which the Seventh Circuit found too indefinite—inherently so—because it purported to include as-yet unidentified students who were *potentially* eligible for special education based on an individual assessment process that had yet to take place, in addition to disabled students who had been identified but whose access to services was delayed or denied in any number of ways after identification. *See Jamie S.*, 668 F.3d at 495. There, the Seventh Circuit emphasized that "identifying disabled students who might be eligible for services is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria" and that "[e]very step of the child-find inquiry and IEP process under the IDEA is child specific and requires the application of trained and particularized professional education judgment." *Id*. at 496.

Although the Court agrees that the diagnosis of mental and behavioral disorders is plainly an individualized and child-specific undertaking, the class definition proposed in this case presupposes such a diagnosis as a condition of class membership. The statutory scheme at work in this case provides the mechanism for identifying children in need of mental health services, including the home and community-based services at issue in this case. Once a child has been diagnosed as requiring such services (*i.e.,* the services have been found to be "medically necessary"), he or she is entitled under the law to whatever services their doctors have recommended for maximum improvement. Receipt of such a diagnosis is a condition of class membership. Therefore, unlike in *Jamie S.*, where membership in the class could not be determined without individualized, court-approved assessments, here, once the class members have been identified—through the workable criteria set forth in the statute and adopted by Illinois regulation, not through a determination of the Court—the required treatment is not subject to further inquiry. To show why this is the case, the Court marches through the statutory scheme in some detail.

The federal Medicaid statute sets forth required content for state plans for medical assistance. 42 U.S.C. § 1396a. Among other things, the plans must provide a means of informing all children eligible for medical assistance of the availability of EPSDT screening services, providing the screening, and "arranging corrective treatment the need for which is disclosed by such child health screening services." *See id*. § 1396a(43) (A)-(C).

The "medical assistance" the State must provide includes the "early and periodic screening, diagnostic, and treatment services . . . for individuals who are eligible under the plan and are under the age of 21." 42 U.S.C. § 1369d(a)(4)(B). Those EPSDT services are defined under §1396d(r) to include various items and services, including screening, vision, dental, and

hearing services, as well as "such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) [the "medical assistance" provision] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, *whether or not such services are covered under the State plan*." 42 U.S.C. § 1396d(r)(5)(emphasis added).[5] Subsection (a), in turn, defines "medical assistance" to include as covered services "other diagnostic, screening, preventative, and rehabilitative services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." 42 U.S.C. § 1396d(a)(13).

The Medicaid statute therefore mandates coverage for the services recommended by a "physician or other licensed practitioner of the healing arts" to correct or ameliorate the diagnosed condition. By virtue of the statutory framework, "medically necessary" services under the EPSDT program are those recommended by the appropriate healthcare provider. This is a

---

[5] The italicized language has been held by numerous courts to render it mandatory for the state to provide as part of its EPSDT program every category of "medical assistance," even though the majority of those categories are optional in every other context. *See, e.g., Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1234 (11th Cir. 2011) ("The 1989 Amendment, however, made it incumbent upon states to provide all 29 categories of care, including 'private duty nursing services,' to Medicaid-eligible children who qualify under the EPSDT provision."); *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1154 (9th Cir. 2007) ("Although states have the option of not providing certain 'optional' services listed in § 1396d(a) to other populations, they must provide all of the services listed in § 1396d(a) to eligible children when such services are found to be medically necessary."); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 589 (5th Cir. 2005) ("The natural reading of § 1396d(r)(5)'s phrases is that all of the health care, services, treatments and other measures described by § 1396d(a) must be provided by state Medicaid agencies when necessary to correct or ameliorate unhealthful conditions discovered by screening, regardless of whether they are covered by the state plan. . . . The language and structure Congress used cannot be read in any other way without rendering the crucial phrases meaningless.").

broad construction, but one that is entirely consistent with the sweeping scope of the EPSDT program, which has been frequently noted by the courts. *E.g., Collins v. Hamilton,* 349 F.3d 371, 376 n.8 (7th Cir. 2003) ("a state's discretion to exclude services deemed 'medically necessary' . . . has been circumscribed by the express mandate of the statute"); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 293 F.3d 472, 480 (8th Cir. 2002) (states must pay for costs of treatment found to ameliorate conditions discovered by EPSDT screenings if such treatments are listed in section 1396d(a)); *Pereira v. Kozlowski*, 996 F.2d 723, 725–26 (4th Cir. 1993) (EPSDT program obligates states "to provide to children under the age of twenty-one all necessary services, including transplants"); *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 26 (D. Mass. 2006) ("The breadth of EPSDT requirements is underscored by the statute's definition of 'medical services'" in § 1396d(a)(13)); *Ekloff v. Rogers*, 443 F. Supp. 2d 1173, 1179-80 (D. Ariz. 2006) (observing that "[e]very Circuit which has examined the scope of the EPSDT program has recognized that states must cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable under §1396d(a)" and that "from reading the legislative history and the Congressional Record, it appears that there is a very strong inference to be inclusive rather than exclusive"); Yael Zakai Cannon, *There's No Place Like Home: Realizing the Vision of Community-Based Mental Health Treatment for Children*, 61 DePaul L. Rev. 1049, 1080 (2012) ((under EPSDT, "*[w]hen doctors find that services are medically necessary*, the state must pay for those services and assure that payments are 'sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in that geographic area'")(emphasis added)).

Illinois' own statutory scheme implements this mandate to cover all treatment for Medicaid-eligible children that their doctors have recommended to correct or ameliorate their diagnosed conditions. Illinois administers the federal EPSDT mandate through its Healthy Kids program. 305 ILCS 5/5-19(a); 89 Ill. Admin. Code 140.485(a) ("The Healthy Kids Program is the Early and Periodic Screening, Diagnosis and Treatment Program mandated by the Social Security Act (see 42 U.S.C. § 1396a(43), 1396d(4)(B)"). Under the program, the State "shall insure Medicaid coverage" for periodic health screenings for children eligible for Healthy Kids—that is, all children "under the age of 21 eligible to receive Medical Assistance." See 305 ILCS 5/5-19(d)(1), (a). The health screening examination "must include," among other things, a Mental Health Assessment.[6] *See id.* § 5-19(e)(1)(A). For all children in the Healthy Kids program, the State "shall provide coverage for all necessary health care, diagnostic services, treatment and other measures to correct or ameliorate defects, physical and mental illnesses, and conditions, whether discovered by the screening services or not." *See id.* § 5-19(f).

Illinois regulations define "medical necessity" and "medically necessary" in a way that mirrors the EPSDT provisions' requirement that eligible children receive all care that an appropriate clinician has recommended to correct or ameliorate a condition:

> Medical Necessity or Medically Necessary - An LPHA[7] has determined through assessment that a client has a diagnosis of

---

[6] Under 59 Ill. Admin. Code § 132.148 (a), a mental health assessment or MHA "is a formal process of gathering information regarding a client's mental and physical status and presenting problems . . . , resulting in the identification of the client's mental health service needs and recommendations for service delivery.

[7] An LPHA, a Licensed Practitioner of the Healing Arts, is "An Illinois licensed health care practitioner who, within the scope of State law, has the ability to independently make a clinical assessment, certify a diagnosis and recommend treatment for persons with a mental illness and who is one of the following: a physician; an advanced practice nurse with psychiatric specialty licensed under the Nurse Practice Act [225 ILCS 65]; a clinical psychologist licensed under the Clinical Psychologist Licensing Act [225 ILCS 15]; a licensed clinical social worker (LCSW) licensed under the Clinical Social Work and Social Work Practice Act [225 ILCS 20]; a licensed

mental illness or serious emotional disorder as defined in the ICD-9-CM or DSM-IV that has resulted in a significant impairment in the client's level of functioning in at least one major life functional area and needs one or more mental health services that are identified in the Mental Health Assessment and ITP[8] to stabilize the client's functioning, or to restore or rehabilitate the client to a maximum level of life functioning. For clients under the age of 21, medical necessity or medically necessary may additionally mean that the client has more than one documented criteria of a mental illness or serious emotional disorder as listed in the DSM-IV that is likely to impact the client's level of role functioning across critical life areas and needs a Medicaid reimbursable Part 132 mental health service recommended by the completion of an approved Healthy Kids screen by a physician or the completion of a Mental Health Assessment and included in an ITP that could not have been omitted without adversely affecting the client's level of functioning.

59 Ill. Admin. Code § 132.25. Thus, under Illinois law, a mental health service is "medically necessary" for a Medicaid-eligible child if a qualified health care practitioner opines that the child "needs" the service to "stabilize the client's functioning, or to restore or rehabilitate the client to a maximum level of life functioning," or that could not be omitted from a treatment plan "without adversely affecting the client's level of functioning" across "critical life areas."

Given this statutory framework, the defendant's position that there can be no workable standard for identifying eligible class members is untenable. Children in the Healthy Kids program who have been diagnosed with a mental illness by an LPHA and whose LPHA has recommended home or community-based services are entitled to coverage for those services. By accepting Medicaid funds, the State already has agreed to the standard defining what mental health treatment is "medically necessary" that is set forth in the EPSDT program and in its own

---

clinical professional counselor (LCPC) licensed under the Professional Counselor and Clinical Professional Counselor Licensing Act [225 ILCS 107]; or a licensed marriage and family therapist (LMFT) licensed under the Marriage and Family Therapist Licensing Act [225 ILCS 55] and 68 Ill. Adm. Code 1283." 59 Ill. Admin. Code § 132.25.

[8] An ITP is an individual treatment plan.

regulations implementing that program. There will be no need for the Court to monitor and review the propriety of those determinations.

This is in sharp contrast to the proposed class in *Jamie S.*, where the Seventh Circuit explained: "A significant segment of the class (of unknown and unknowable size) comprises disabled students who may have been eligible for special education but were *not identified* and *remain unidentified*." 668 F.3d at 495 (emphasis in original). One of the claims in *Jamie S.* was that the school district failed to meet its statutory obligation to seek out and identity special-education eligible children; the very nature of that claim rendered certifying a sufficiently definite class improbable; it is akin to proving a negative. *See id.* ("How is the court to decide whether there was reason to believe in 2000–2005 that a presently unidentified child was potentially eligible for special-education services from MPS?") & *id.* at 497 ("MPS's alleged failure to identify disabled students in no way pins down the identities of the class members; the relevant conduct here is not a discrete action as in *Rochford* but rather a failure to act.").

That said, it is not necessary, nor would it be appropriate, to further limit the class definition to those children who "are not receiving" the home and community based services that their doctors have recommended. As discussed further in the context of the commonality requirement, the question whether the state provides the required services is a common question of fact that goes to the state's liability. That question of liability cannot be used to define the class; this would result in a "fail-safe" class defined in such a way that each class member "either wins, or by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 825 (7th Cir. 2012). As applicable here, a plaintiff who was a member of the class by virtue of establishing that she was not receiving services would succeed on the merits, but if the state proved she was receiving the

services, she would not be bound by the judgment because she would not be part of the class. Moreover, to fold into the class definition the question of which children are receiving the required services is, as the Director argues, to invite individualized, fact-specific inquiry into the identification of the class.[9] The plaintiffs claim that the state has a policy of not covering home and community-based care beyond weekly medication management and counseling sessions, and that this level of care fails to satisfy the EPSDT mandate. Presumably, the state will contend that the services it covers satisfy the mandate and that it is not obligated to provide what the plaintiffs seek; this is the core of the dispute. Whether the state provides EPSDT-compliant services as a matter of policy is the ultimate liability question, and therefore, all the children eligible for the services must be included in the class.

Thus, it is enough to say that the class consists of the subset of those children who have been found by their LPHAs to need in-home or community based services. This is the model used in *Collins v. Hamilton*, 349 F.3d 371 (7th Cir. 2003). There, the plaintiffs sued to obtain coverage for treatment in psychiatric residential treatment facilities ("PRTF"), but the class definition was not limited to patients for whom such care was being denied. The class consisted of "Medicaid-eligible children under age twenty-one who require mental health services for which Federal Financial Participation is available." *See id*. at 372 n.1. The State of Indiana was alleged to have a policy of not covering residential placement services, even when deemed

---

[9] Indeed, there remains a risk that the liability determination will require these individual determinations. As further discussed in the context of commonality, the Court has satisfied itself that the plaintiffs sufficiently allege a system-wide policy of not covering the necessary services, and instead favoring an institutional setting when intensive care is indicated. That is sufficient to entitle the plaintiffs to discovery on a class-wide basis. However, if discovery reveals that the plaintiffs' assertion of a systemic policy not to cover intensive home and community-based care is untenable, then decertification of the class could be required if liability turns on individual assessments of whether the services provided by the state fall within the category of "home or community-based services." Class-wide determination of liability is likely possible only in the context of a generally applicable policy that violates EPSDT.

medically necessary; it is therefore appropriate that the class consisted of all the patients eligible for the services.[10] Here too, the class need only be defined to include those children who have received a diagnosis and recommendation by an appropriate provider for the home or community based services; at that point, he or she is entitled to EPSDT services. Defined in this way, the individualized determinations are complete at the time a plaintiff's membership in the class is determined. (On this score, the defendant is correct that the class cannot consist of "future" Medicaid recipients, and the plaintiffs have excised the offending term from their original proposed class definition.)

There is another aspect of the proposed class definition that cannot stand because, depending on the intended meaning, it is either overly broad or superfluous. The plaintiffs propose to include within the class children who are segregated, have been segregated in the past, or are "at risk" of future segregation. The inclusion of potential future segregation as a basis for class membership renders the class too indefinite to certify; there is no objective way to determine which children are sufficiently "at risk" to make them eligible. Without an objective standard—such as the medically necessary standard—only expert opinion could establish a likelihood of future institutionalization, and that opinion would be subject to competing testimony.

In any case, segregation is not a necessary element of the class definition. A child who is being deprived of medically necessary home or community based services shares in the EPSDT claim whether she is being deprived of the services altogether or whether she has access to the services only in an institutional setting; either way, she is not receiving what the state is

---

[10] The *Collins* decision addresses the state's liability, not the issue of the appropriate definition of the class or whether class certification was proper; the Court's reference to *Collins* is a comparison, not the application of precedent.

obligated to provide. The institutionalization might be a separate legal violation (of the integration mandate), but it is not clear why it should be a requirement for class membership. If the plaintiffs' allegations are true, then any child who is being denied medically necessary home and community-based care is "at risk" of segregation, because they say that intensive treatment is not available outside psychiatric hospitals. The total overlap between the plaintiffs' claims is evident from the complaint, where the same factual predicate supports both the section 1983 claims (for violation of EPSDT) and the ADA/Rehabilitation Act claims (for violation of the integration mandate). Understood this way, segregation is an *effect* of the policy of not providing home and community-based services. But the inclusion of the segregation language does not add anything but confusion to the class definition itself.

Relatedly, there is no need to define the class by reference to whether the affected children "do not oppose" community services, any more than there is need to define any other class by reference to whether the potential members oppose the relief being sought. The plaintiffs added that limitation to address one of Judge Pallmeyer's typicality concerns. But the express exclusion from the class of those children for whom institutionalization is required or desired is not necessary—and indeed, it is inconsistent with the class definition. The class consists only of children whose LPHAs have recommended home and community-based services. Children for whom only institutionalization is recommended are not being deprived of *medically necessary* home or community-based treatment. And children who prefer institutionalization despite a provider's recommendation for home or community based care cannot be carved out of the class because the applicable law requires the state to provide services in accordance with the recommendations of a LPHA, not with the patients' (or their guardians')

preferences.[11] Accordingly, the qualifying phrase, "who would not oppose community services," should be omitted from the class definition.

By now it should be clear that the class definition proposed by the plaintiffs must be altered, and it is within this court's discretion to do so. *See, e.g., In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011). Synthesizing the discussion above following class definition best comports with the nature of the plaintiffs' claims and the governing legal standards for defining and certifying a class:

> All Medicaid-eligible children under the age of 21 in the State of Illinois: (1) who have been diagnosed with a mental health or behavioral disorder; and (2) for whom a licensed practitioner of the healing arts has recommended intensive home- and community-based services to correct or ameliorate their disorders.

## 2.    Numerosity

The Director originally conceded numerosity in response to the plaintiffs' first class certification motion, and her present motion is predicated on the argument that the class members cannot be readily identified. As that argument has been disposed of above, the related numerosity objection fails. Here, the class is defined in such a way that the number of class members is knowable even if presently unknown; certainly records exist that identify children under age 21 receiving Medicaid, and the plaintiffs' evidence suggests that records also exist to

---

[11] Arguably, children who *prefer* institutionalization are not harmed by the state's allegedly unlawful policy. And the Court is cognizant that "a class that is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct" is one that is "defined too broadly to permit certification." *See Messner v. Northshore Univ. Healthsystem*, 69 F.3d 802, 824 (7th Cir. 2012). At this stage, however, there is no way to know whether there is a "great" number of children for whom home or community-based care has been recommended but who nevertheless prefer institutionalization; to the extent such children exist, it might be precisely because of the deficiencies in home or community-based services that the plaintiffs complain about. But if it were to become evident that there is a critical mass of children who desire institutionalization, the questions of the class definition and certification could be reexamined.

identify children with mental health and behavioral disorders. The precise number of such children has not yet been determined, of course, but a finding of sufficient numerosity does not require that degree of precision. *See Marcial v. Coronet Ins. Co*., 880 F.2d 954, 957 (7th Cir. 1989) ("plaintiffs are not required to specify the exact number of persons in the class"); *Vergara v. Hampton*, 581 F.2d 1281, 1284 (7th Cir. 1978) ("The difficulty in determining the exact number of class members does not preclude class certification.").

The plaintiffs have established that the class members are sufficiently numerous and that joinder would be impracticable. They submitted reports from both DHS and the State's Community & Residential Services Authority to support the existence of a large number of children with mental illness and emotional or behavioral disorders and the current under-service of that population. For example, DHS reported in 2010 that the State identified over 18,000 children under 21 with severe mental illness or emotional disturbances. Only 220 of these children received intensive community based services, either in their homes or in residential group homes. If only a small fraction of the remaining children also have been recommended for such services, the numerosity threshold is easily met. Indeed, another DHS report that the plaintiffs submit identified in 2011 over 2000 children with either an "emergency need" or "critical need" for in-home or other support who are not receiving those services. The plaintiffs' evidence suggests that the class numbers in the hundreds, if not thousands, of members, which easily satisfies the numerosity requirement.

Moreover, the plaintiffs convincingly argue—and the Director does not dispute—that joinder of the plaintiffs would be impracticable because of their particular circumstances. The putative class consists of an extremely vulnerable population because of their youth—in most cases, the plaintiffs would need an adult next friend to initiate suit—severe health issues, and

limited financial means, all of which make individual suits impracticable. Moreover, they are scattered throughout the state, impeding their ability to participate even if joinder could be accomplished. *See Arenson v. Whitehall Convalescent & Nursing Home, Inc*., 164 F.R.D. 659, 663 (N.D. Ill. 1996) ("When analyzing whether joinder is impracticable, factors such as judicial economy, geographic diversity of class members, and the ability of class members to institute individual lawsuits should also be considered."). Therefore, the numerosity requirement is met.

### 3. Typicality

The requirement of typicality also is met here. For the typicality requirement to be met, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co*., 633 F.3d 574, 586 (7th Cir. 2011); *see also Gen. Tel. Co.*, 457 U.S. at 157–159. The named plaintiffs all suffer from mental illness and/or behavioral or emotional disorders, stemming from developmental disabilities and—as of the Second Amended Complaint—from MI/SED not attributable to developmental disability; moreover, all of them are alleged to have been denied access to intensive community-based services based on the failure of the Department to make them available, in violation of EPSDT and the integration mandate. Although Judge Pallmeyer pointed out that services are funded differently, and by different divisions of DHS, depending on whether the Medicaid-eligible child's condition results from a developmental disability, this distinction is not material where the common question is whether the state is providing required services. If the services are "medically necessary," the origin of the condition is irrelevant. To the extent that either party can show that the distinction has continuing relevance, however, it can be addressed with the certification of sub-classes.

### 4. Commonality

Commonality is the final Rule 23(a) factor for the plaintiffs to establish, and it is the most difficult. The defendant contends that the commonality of the proposed class fails pursuant to *Dukes* and *Jamie S*. because all of the common issues that the plaintiffs identify "must be answered separately for each child based upon individualized questions of fact and law, and the answers are unique to each child's particular circumstances." Mem., Dkt. # 56 at 8. But again, this objection is founded primarily on the misplaced notion that class relief will require individualized, judicially monitored, mental health assessments of all children eligible for EPSDT services.

To satisfy the commonality requirement, a single common question will do, *Dukes*, 131 S. Ct. at 2556; *Jamie S*., 668 F.3d at 497, but that common question cannot be just a superficial similarity such as whether each class member shares a characteristic or "suffered a violation of the same provision of law." *Jamie S.,* 668 F.3d at 497 (citing *Dukes*, 131 S. Ct. at 2551). "[C]ommonality requires the plaintiffs to demonstrate that the class members have suffered the same injury." *Id*. (internal quotation marks and citations omitted); *see Dukes*, 131 S. Ct. at 2551. Not only must the class claims "depend on a common contention," that common contention "must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551; *Jamie* S., 668 F.3d at 497. For purposes of Rule 23(a)'s commonality requirement, the inquiry is not whether common issues "predominate," but only whether there is at least a single common contention that satisfies the above criteria. *See Dukes*, 131 S. Ct. at 2556-57.

The plaintiffs set forth a list of "common questions of law and fact":

(a) Whether the Defendant's failure to provide medically necessary home and community-based services to children with behavioral and emotional disorders violates the EPSDT mandate of Title XIX of the Social Security Act.

(b) Whether the Defendant violated the Americans with Disabilities Act (ADA) and Rehabilitation Act by failing to provide medically necessary services in the most integrated setting.

(c) Whether as a result of the Defendant's continued over-reliance on institutions, hundreds of children cycle through hospitals, emergency rooms, acute care facilities, and residential treatment centers without obtaining any long-term relief.

(d) Whether the State of Illinois system of mental health care is so weak and uncoordinated that most children are released from facilities with little or ineffective follow-up community mental health care.

(e) Whether the services offered by the community mental health center after discharge from an institutional setting consists of little more than minimal medication management and outpatient counseling once a week for one hour, which is inadequate for a child with significant behavioral and emotional problems.

(f) Whether the Defendant opts to fund children living with behavioral and emotional problems in hospitals and institutions, rather than providing the intensive individualized care that allows children to remain in their homes and communities.

Motion, Dkt. # 51 at 3–4. The plaintiffs further contend—inaptly, for purposes of Rule 23(a)—that these common issues "predominate" over individualized issues among class members.

At first glance, issues (a) and (b) bear some similarity to the generalized questions that *Dukes* and *Jamie S*. preclude as grounds for a finding of commonality—those which simply ask whether the class members all "suffered a violation of the same provision of law." But in this case, these questions, particularly when viewed in tandem with issues (e) and (f), do more than that—they ask whether home and community-based treatment found to be "medically necessary," and therefore mandatory for the state to provide, is nevertheless unavailable in Illinois. This is not a question of individual violations of the same law, but of systemic failure.

Issues (a) and (e) posit that outside of institutions, the only home or community-based services available are medication management and extremely limited out-patient counseling at community mental health centers. Issues (b) and (f) also home in on the same central issue: whether the state provides intensive mental health treatment to children only in hospitals and institutions and fails to provide any intensive, individualized care that is community-based or in the home.

This is the central, common, issue in the plaintiffs' claim that the State's system violates both the EPSDT provisions and the integration mandate of the ADA and the Rehabilitation Act: whether there is system-wide failure to provide services that already have been prescribed and that, therefore, the EPSDT program requires the State to provide. That is why, as already discussed, the class should consist of all children *eligible for* home and community-based services (by virtue of their doctors' recommendations for such services). According to the plaintiffs, the State covers intensive treatment only in an institutional setting and does not cover any home and community-based care other than weekly outpatient counseling and medication management. If this is so, then every plaintiff is suffering the same injury as a result of a general policy of the State—even if the services recommended for each patient vary among the class members. And it is resolvable on a class-wide basis. Indeed, *Jamie S.* specifically allows for a different result where a "systemic failure" or an "illegal policy" is alleged; in such cases, the policy is the "glue" that unites otherwise individualized claims. 668 F. 3d at 498 (citing *Dukes*, 131 S. Ct. at 2552-54); *see Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 898 (7th Cir. 2012) ("This single national policy was the missing ingredient" in *Dukes*).[12]

---

[12] The other issues plaintiffs list do not establish commonality. Issue (c) does not identify what *Dukes* calls "a common contention" that is "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is

This case is less like *Jamie S.*—where even the identified class members had been injured in different ways—and more akin to *Fields v. Maram*, No. 04 C 0174, 2004 WL 1879997 (N.D. Ill. 2004), a case in which the plaintiffs, nursing home residents with various types of disabilities that impaired their ability to walk, alleged that the State failed to provide medically necessary motorized wheelchairs. In *Fields*, the commonality requirement was satisfied because there was a credible allegation of a "broad policy" that motorized wheelchairs were not approved for Medicaid recipients in nursing homes. 2004 WL 1879997, at *6. The plaintiffs in this case have also alleged a broad policy of providing intensive care for mental and behavioral disorders only in an institutional setting; and, as in *Fields*, the defendant's contention that no such policy exists will be left to the merits stage. *Id.* at *7. If, through discovery, it becomes clear that individualized determinations are necessary to determine on a case-by-case basis whether the State is adequately providing the services required for each eligible child, it would follow that

---

central to the validity of each one of the claims in one stroke." An affirmative answer would establish that the class members do not receive "long-term relief" from the State. Even if it were a relevant inquiry, answering it would not a resolve a "central issue," such as whether the State provides the four EPSDT requirements (The State must (i) "inform[]" the eligible minors of the availability of EPSDT services; (ii) "provid[e] or arrang[e] for screening services when they are requested; (iii) "arrang[e] for corrective treatment"; and (iv) "report[] to the Secretary" certain statistics") or whether the State fails to provide the required level of integration in the available treatment options. Moreover, this question is not resolvable on a class-wide basis; plainly it could not be determined "in one stroke" that hundreds of children "cycle through" institutions without obtaining long-term relief; the facts of each child's experience could be expected to vary widely. The same flaws are present with respect to issue (d). The weakness of Illinois' healthcare system, while surely implicated in a broad sense, is not a "central issue" to the claims; moreover, this question veers away from the plaintiffs' claims regarding home and community-based services, introducing for the first time the concept of "follow-up care." Worse still, it introduces a vague and impossible-to-administer standard. EPSDT regulations define precisely what services must be provided; by contrast, whether children receive "effective" follow-up care after institutionalization is a subjective determination with no obvious relevance to the plaintiff's core claims (again, the law does not require "effective" care; it requires the provision of services). And whether the care is "effective" could not be resolved "in one stroke" on a class-wide basis, in any event.

the common issue cannot be resolved on a class-wide basis, and decertification would likely follow.

As the Court has already ruled, the complaint as a whole sufficiently alleges the systemic failure to provide required coverage for home and community based services, the effect of which is inappropriate isolation of children. This system-wide failure—which, it bears mentioning, has merely been alleged, not proved—distinguishes this case from those relied upon by the defendants and supplies a common contention capable of resolution on a class-wide basis.

The Court concludes that, with appropriate modifications to the class definition as discussed above, the prospective class is identifiable, and the requirements of Rule 23(a) are met.

**B. Rule 23(b)(2) Requirements**

With the Rule 23(a) prerequisites met, the plaintiff still must demonstrate that class treatment is appropriate pursuant to Rule 23(b)(2); unfortunately, only a scant page of their brief attempts to make that case, and the defendants merely rely on their arguments in opposition to the first class certification motion, which were rejected by Judge Pallmeyer. *See* Mem. Op., Dkt. # 45 at 17-18 (explaining that neither *Jamie S.* nor *Dukes* would preclude certification of the proposed Rule 23(b)(2) class where no monetary relief was at issue, and the plaintiffs were not seeking "judicial determination of the individualized services to which each class member[] is entitled under the [EPSDT program], and the court would be unwilling to grant such relief.")

As noted earlier, certification of an injunction class is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Seventh Circuit has emphasized the importance the final phrase: "The injunctive or declaratory relief sought must be 'final' to 'the class as a whole.'"

*Jamie S.*, 668 F.3d at 499 (citing *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892–94 (7th Cir. 2011). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 131 S. Ct. at 2557.

The Court agrees with Judge Pallmeyer that neither *Jamie S.* nor *Dukes* bars certification of a (b)(2) class in this case.[13] First of all, *Dukes* is instructive in this case as to Rule 23(a)(2)'s commonality requirement; but to the extent the Supreme Court addressed Rule 23(b)(2), it was primarily to hold that individualized claims for monetary relief do not belong in a (b)(2) class. *See Dukes*, 131 S. Ct. at 2558-2559. Here, success on the plaintiffs' claims will require policy modifications to properly implement EPSDT and the integration mandate; by their very nature such policy changes are generally applicable, and therefore would benefit all class members. This is consistent with *Dukes*' affirmation of the basic principle that the remedy in a Rule 23(b)(2) class action must be of an "indivisible nature" and provide relief to each member of the class. *See* 131 S. Ct. at 2557. This case is also distinguishable from *Jamie S.*, where the court explained that a judgment for the class in that case would "merely initiate a process through which highly individualized determinations of liability and remedy are made," and therefore the remedy was neither class-wide nor final. *See* 668 F.3d at 499. Any "highly individualized determinations" required in this case have already been made—by definition, the class would consist only of children who are not receiving services that have been prescribed as "medically necessary" and which the state must therefore provide under the EPSDT program. The only

---

[13] As noted, even though Judge Pallmeyer rejected her arguments the first time around, the defendant has merely reincorporated them in response to the current motion. She has not attempted to identify any error in the court's reasoning or conclusion.

possible remedy is the statewide implementation of the heretofore unfulfilled requirements of these programs, likely through new regulations that provide the services have been unavailable on a system-wide basis.

Thus, this case is more closely analogous to *Collins*, in which the Seventh Circuit affirmed the grant of a permanent injunction requiring the State of Indiana to provide Medicaid coverage for medically necessary placement in psychiatric residential treatment facilities. 349 F.3d at 376. In violation of the EPSDT mandate, the state had excluded such services. Although *Collins* predates both *Dukes* and *Jamie S.*, it is consistent with those cases because Indiana's exclusion was a system-wide policy of general applicability. So, too, in this case, the plaintiffs allege a failure by the State of Illinois to cover services that are mandatory under the EPSDT program.

It bears noting, however, that the Court is not endorsing the broad remedial language in the plaintiffs' prayer for relief.[14] In all likelihood, if the plaintiffs prevail on the merits, the resulting injunction will be more narrow, and more specific, than the general order the plaintiffs outline.[15] *See, e.g., Rosie D. ex rel. John D. v. Romney*, 474 F. Supp. 2d 238 (D. Mass. 2007)

---

[14] In the Second Amended Complaint, the plaintiffs request preliminary and permanent injunctive relief "enjoining the Defendant from subjecting the Plaintiffs and the Class to practices that violate[] their rights under the Medicaid Act, the Americans with Disabilities Act and the Rehabilitation Act" and requiring the Defendant to "(i) inform individuals with disabilities that they may be eligible for community-based services and have the choice of such services; (ii) regularly provide assessments to determine eligibility for community-based services; and (iii) promptly provide appropriate services and support to qualifying individuals in the community, creating a viable alternative to treatment in institutional settings." The plaintiffs also ask the Court to "declare unlawful the Defendant's failure to comply with mandate of the Medicaid Act, the Americans with Disabilities Act and the Rehabilitation Act."

[15] A proper injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *See* Fed. R. Civ. P. 65(d). "Injunctions that 'merely instruct the enjoined party not to violate a statute' generally are overbroad, increasing 'the likelihood of unwarranted contempt proceedings for acts unlike or unrelated to those originally judged unlawful.'" *Lineback v. Spurlino*

(remedial order following decision that state was liable for violating the EPSDT rights of a class of Medicaid-eligible children with serious emotional disturbances). But it would be premature to define the precise contours of the remedy at this early stage; the plaintiffs will first have to establish their entitlement to injunctive relief. It suffices to conclude that an injunction or declaration could be fashioned that would provide relief to each member of the class, in the form of requiring modifications to the allegedly unlawful policies at issue. Accordingly, the requirements of Rule 23(b)(2) are met, and the Court will grant class certification but alter the class definition to conform to the principles laid out in its discussion.

### C.      Motion to Intervene

Three Medicaid-eligible children who have been adjudicated as abused, neglected, or dependent and who are wards of the Illinois juvenile court's Child Protection Division, move, through the Public Guardian,[16] to intervene as named plaintiffs in this case if a class is certified. They seeks to intervene on behalf of a class of similarly situated children, who, the intervenors assert, would be members of the proposed class in this case but whose interests could not be adequately protected by the current named plaintiffs because of their unique status as wards of the state. In particular, although the children are Medicaid-eligible, they are not entitled to the same sources of funding—*e.g.*, individual care grants—and their rights to services are governed not only by Medicaid but the Juvenile Court Act, the Child and Family Services Act, and various regulations of DCFS.  DCFS does not have healthcare obligations to plaintiffs who are not wards of the state—rather, the current named plaintiffs are seeking services from DHS—and therefore

---

*Materials, LLC*, 546 F.3d 491, 504 (7th Cir. 2008) (quoting *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1315 (Fed. Cir. 2004)). Accordingly, any injunctive relief in this case would have to set forth a detailed and specific plan for the State to comply with EPSDT and/or the integration mandate.

[16] D. Jean Ortega-Piron, the Department of Child and Family Services Guardianship Administrator.

the intervenors fear that the current named plaintiffs cannot adequately represent them with respect to the other agencies they depend on for services. The Director argues that the proposed intervenors are improper parties to this litigation for myriad reasons, including lack of subject matter jurisdiction, res judicata, and abstention.

Neither party had the benefit of the Court's decision on class certification in briefing the issue of intervention—indeed, the motion to intervene was explicitly contingent upon certification of a class, and as such, it is questionable whether briefing should have proceeded at all until that threshold question was answered. Because the briefs do not reflect the current state of the litigation, the Court will deny the motion to intervene without prejudice. A renewed motion may be filed within 30 days. The proposed intervenors will certainly want to modify their motion for certification of a subclass (Dkt # 60-1) based upon the Court's decision on class certification, but that amended motion should not be brought until the Court has ruled on the question of  intervention. In any response to a renewed motion to intervene, the State should limit its arguments to whether intervention would be consistent with Federal Rule of Civil Procedure 24 (and it should set forth its arguments directly, not by incorporating portions of old briefs). Although, particularly with respect to permissive intervention, that inquiry might implicate issues such as abstention, the defendant should avoid briefing any issues that are affirmative defenses, such as res judicata, which are best raised by motion after a decision to allow intervention, if that is the outcome. To the extent possible, the substantive issues regarding the merits of the intervenors' claims should not be rolled into the threshold question of whether intervention is appropriate.

* * *

In conclusion, the motion for certification of a class pursuant to Rule 23(b)(2) is granted, and the motion to intervene is denied without prejudice.

The Court will certify class defined as follows:

> All Medicaid-eligible children under the age of 21 in the State of Illinois: (1) who have been diagnosed with a mental health or behavioral disorder; and (2) for whom a licensed practitioner of the healing arts has recommended intensive home- and community-based services to correct or ameliorate their disorders.

Furthermore, in accordance with Rule 23(c)(1)(B) and Rule 23(g), the Court will appoint as class counsel Robert H. Farley Jr., Michelle N. Schneiderheinze, and Mary Denise Cahill as class counsel.

Date: February 13, 2014

John J. Tharp, Jr.
United States District Judge